[No. G010372. Fourth Dist., Div. Three. Feb. 28, 1992.]

LARRY D. HUFFT, Plaintiff and Appellant, v.
MARCEL I. HOROWITZ et al., Defendants and Respondents.

**COUNSEL**

John F. Murphy and Benjamin Casillas for Plaintiff and Appellant.

Schaffer & Lax and Barbara C. Fasiska for Defendants and Respondents.

## OPINION

**SONENSHINE, J.**—Larry D. Hufft appeals from a summary judgment entered in favor of American Medical Systems, Inc. (AMS) in a product liability action involving an allegedly defective inflatable penile prosthesis. Hufft contends the trial court erred in granting summary judgment because triable issues of material fact exist as to all causes of action. In our review, we must decide whether the rule of *Brown* v. *Superior Court* (1988) 44 Cal.3d 1049 [245 Cal.Rptr. 412, 751 P.2d 470], immunizing manufacturers of prescription drugs from strict liability for design defects, should be extended to manufacturers of implanted prescription medical devices. *Brown* holds, "[A] manufacturer is not strictly liable for injuries caused by a prescription drug so long as the drug was properly prepared and accompanied by warnings of its dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution." (*Id.* at p. 1069, fn. omitted.)

As will be seen, we believe the compelling public policy reasons articulated by the *Brown* court with regard to prescription drugs apply with equal force when the product is an implanted medical device. Thus, following *Brown*'s lead, we hold that a manufacturer is not strictly liable for injuries caused by an implanted prescription medical product which has been (1) properly made and (2) distributed with information regarding risks and dangers of which the manufacturer knew or should have known at the time.

Here, although there is no strict liability cause of action for design defect, AMS presented no evidence of the state of its knowledge of the risks at the time it distributed the product. It therefore failed to negate the existence of triable issues of fact as to the adequacy of its warnings. It was not entitled to summary judgment.

I

In April of 1987, Hufft underwent surgical implantation of an inflatable penile prosthesis (IPP) to alleviate a penile erectile dysfunction. The IPP caused him to experience an almost constant erection, persistent pain and emotional distress. Three corrective surgeries failed to remedy the problem. Eventually, Hufft had the IPP removed and replaced with a different type of device. He sued his doctors, their medical group and the IPP manufacturer, AMS, seeking recovery against AMS on causes of action for negligence, strict liability and breach of express and implied warranties.

Shortly before the scheduled trial date, AMS moved for summary judgment or, in the alternative, for summary adjudication of certain issues. It

argued as a matter of law it was not subject to breach of warranty liability or strict liability for design defect or failure to warn because the IPP is an unavoidably unsafe prescription medical device approved by the Food and Drug Administration (FDA). It asserted it had fulfilled its duty to warn of known risks associated with implantation of the IPP. It contended it was not liable for manufacturing defects because postincident testing demonstrated the integrity of the product. In evidentiary support of the motion, it offered the declaration of its research and development vice-president, Michael Mikulich, and deposition testimony of Hufft and two of his physicians.

On the date his opposition papers were due, Hufft filed only a declaration asking for a continuance of the scheduled hearing to take the deposition of Mikulich and perform other discovery. AMS opposed the continuance, contending Hufft had failed to conduct timely discovery. The trial court denied the motion for continuance, noting the discovery cut-off date had passed. Then, without discussion of the merits, it granted the motion for summary judgment and entered judgment in favor of AMS.

Hufft moved for reconsideration, belatedly submitting the declaration of an expert opining the IPP was defectively designed and inadequately labeled. Finding Hufft had no acceptable explanation of his inability to present the evidence earlier, the court denied the motion for reconsideration. ▆▆▆▆▆ This appeal followed.[1]

## II

### STANDARD OF REVIEW

Code of Civil Procedure section 437c, subdivision (c) directs the trial court to grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ▆ The determination whether triable facts exist must be made in light of the issues defined by the

---

[1]Hufft purports to appeal from the court's order denying his request for continuance and the subsequent order denying his postjudgment motion for reconsideration. Neither order is appealable. (*Maynard* v. *Bullis* (1950) 99 Cal.App.2d 805, 807 [222 P.2d 685]; *Passavanti* v. *Williams* (1990) 225 Cal.App.3d 1602, 1607, fn. 5 [275 Cal.Rptr. 887].) Moreover, in light of our disposition of the case, we need not decide whether the orders were proper. AMS failed to carry its initial burden of showing entitlement to judgment, thus it is irrelevant that Hufft was not granted a continuance to gather opposition evidence.

Additionally, judgment was entered three weeks before the reconsideration motion was heard; by that time the court's power to correct its mistake did not include reconsideration. "*Judicial error*, i.e., an erroneous decision can only be rectified by the regular procedures for attack on judgment: motion for new trial, motion to vacate judgment, appeal, or, in certain special situations, independent action in equity." (7 Witkin. Cal. Procedure (3d ed. 1985) Judgment, § 66, p. 500; *Passavanti* v. *Williams, supra,* 225 Cal.App.3d at p. 1606.)

pleadings. (*Leasman* v. *Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 380 [121 Cal.Rptr. 768].) If a plaintiff pleads several theories, the defendant has the burden of demonstrating there are no material facts requiring trial on any of them. "The moving defendant whose declarations omit facts as to any such theory . . . permits that portion of the complaint to be unchallenged." (*Conn* v. *National Can Corp.* (1981) 124 Cal.App.3d 630, 639 [177 Cal.Rptr. 445].) ■ Where, as in this case, no opposition is presented, the moving party still has the burden of eliminating all triable issues of fact. (*Harman* v. *Mono General Hospital* (1982) 131 Cal.App.3d 607, 613 [182 Cal.Rptr. 570].)

## III

### STRICT LIABILITY AND THE *BROWN* EXCEPTION

Hufft seeks recovery against AMS on a theory of strict liability. ■ A manufacturer is strictly liable for injuries caused by a product that is (1) defectively manufactured, (2) defectively designed, or (3) distributed without adequate instructions or warnings of its potential for harm. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 428 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) A defectively manufactured product differs from the manufacturer's intended result, such as the exploding bottle in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453 [150 P.2d 436]. A defectively designed product either "fails to satisfy such ordinary consumer expectations as to safety in its intended or reasonably foreseeable operation," or has an inherent risk of danger that outweighs its benefits. (*Barker, supra*, at p. 430.) The risk/benefit test considers factors such as seriousness of the potential danger, likelihood of its occurrence, and feasibility, cost and "adverse consequences to the product and the consumer" of a safer alternative design. (*Id.* at p. 431.) Under "warning defect" strict liability, a product, even though faultlessly made, is defective if it is "unreasonably dangerous to place . . . in the hands of a user without a suitable warning and the product is supplied and no warning is given." (*Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 53 [46 Cal.Rptr. 552].) It is now settled that "knowledge or knowability [of the danger] is a component of strict liability for failure to warn." (*Anderson* v. *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1000 [281 Cal.Rptr. 528, 810 P.2d 549].)

In *Brown* v. *Superior Court, supra*, 44 Cal.3d 1049, the Supreme Court considered the application of strict liability to prescription drugs. Plaintiff alleged her mother's ingestion of diethylstilbestrol (DES) during pregnancy caused plaintiff *in utero* injury. Tracing the development of the doctrine of strict liability, the court noted several underlying public policy considerations: "that the manufacturer, unlike the public, can anticipate or guard

against the recurrence of hazards, that the cost of injury may be an overwhelming misfortune to the person injured whereas the manufacturer can insure against the risk and distribute the cost among the consuming public, and that it is in the public interest to discourage the marketing of defective products." (*Id.* at p. 1056.)

The *Brown* court observed lawmakers had long expressed concerns that imposition of strict liability in the field of medical drugs might be " 'against the public interest' " because of " 'the very serious tendency to stifle medical research and testing.' " (*Brown* v. *Superior Court, supra,* 44 Cal.3d at p. 1058.) Those concerns led to the creation of an exception to traditional strict liability, embodied in section 402A of the Restatement Second of Torts, comment k (hereafter comment k), which provides:

"*k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he [or she] has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

The *Brown* court observed comment k is not based on strict liability; rather, it states a negligence principle that "would impose liability on a drug manufacturer only if it failed to warn of a defect of which it either knew or should have known." (*Brown* v. *Superior Court, supra,* 44 Cal.3d at p. 1059.) It further noted comment k had been adopted in the "overwhelming majority of jurisdictions that have considered the matter" and "embraced" in several

decisions of the Court of Appeal.[2] (*Id.* at p. 1058.) Identifying three possible tests to determine a drug manufacturer's liability for a defectively designed drug,[3] it concluded: "(1) [Liability] should not be measured by the standards of strict liability; (2) because of the public interest in the development, availability, and reasonable price of drugs, the appropriate test for determining responsibility is the test stated in comment k; and (3) for these same reasons of policy, we disapprove the holding of *Kearl*[4] that only those prescription drugs found to be 'unavoidably dangerous' should be measured by the comment k standard and that strict liability should apply to drugs that do not meet that description." (*Brown* v. *Superior Court, supra,* at p. 1061.)

Underlying the *Brown* court's adoption of the comment k standard for medical drug manufacturers is "an important distinction" between prescription drugs which "may be necessary to alleviate pain and suffering or to sustain life," and various commercial products "used to make work easier or to provide pleasure," and "other important medical products" which are not unavoidably harmful. (*Brown* v. *Superior Court, supra,* 44 Cal.3d at p. 1063.) "Because of these distinctions, the broader public interest in the availability of drugs at an affordable price must be considered in deciding the appropriate standard for liability for injuries resulting from their use." (*Ibid.*)

The *Brown* court discussed at great length special considerations setting prescription drugs sufficiently apart from other products to justify an exception to the traditional law of strict liability. For instance, although drugs might be made safer if withheld until more dangerous side effects were

---

[2]In *Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958 [95 Cal.Rptr. 381], *Christofferson* v. *Kaiser Foundation Hospitals* (1971) 15 Cal.App.3d 75 [92 Cal.Rptr. 825, 53 A.L.R.3d 292] and *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689 [60 Cal.Rptr. 398, 29 A.L.R.3d 988], California appellate courts applied comment k's standard to determine manufacturer liability for injuries resulting from prescription drugs.

[3]"We appear, then to have three distinct choices: (1) to hold that the manufacturer of a prescription drug is strictly liable for a defect in its product because it was defectively designed, as that term is defined in *Barker*, or because of a failure to warn of its dangerous propensities even though such dangers were neither known nor scientifically knowable at the time of distribution; (2) to determine that liability attaches only if a manufacturer fails to warn of dangerous propensities of which it was or should have been aware, in conformity with comment k; or (3) to decide . . . [on a case by case basis] . . . that strict liability for design defects should apply to prescription drugs unless the particular drug which caused the injury is found to be 'unavoidably dangerous.' " (*Brown* v. *Superior Court, supra,* 44 Cal.3d at pp. 1060-1061, fn. omitted.)

[4]In *Kearl* v. *Lederle Laboratories* (1985) 172 Cal.App.3d 812 [218 Cal.Rptr. 453], it was suggested that courts should ask three questions in determining whether to apply the protection of comment k: (1) Was the product intended to provide an exceptionally important benefit that made its availability highly desirable; (2) was the risk posed by the product substantial and unavoidable when the product was distributed; and (3) was the interest in availability of the product, measured as of the time of distribution, outweighed by the interest in promoting enhanced accountability. (172 Cal.App.3d at p. 830.)

known or knowable, "[p]ublic policy favors the development and marketing of new beneficial drugs," even in the face of potentially serious risks, "because drugs can save lives and reduce pain and suffering." (*Brown* v. *Superior Court, supra,* 44 Cal.3d at p. 1063.) Strict liability might prove to be a disincentive to manufacturers to develop and market beneficial drugs because of "fear of large adverse monetary judgments" and the expense of strict liability insurance, costs that could "place the cost of medication beyond the reach of those who need it most." (*Ibid.*) The court observed the latter consideration "is far from theoretical," and cited several examples in which the price of drugs and vaccines skyrocketed or drugs were withdrawn from the market due to costs of litigation and liability insurance and difficulty in obtaining adequate insurance. (*Id.* at pp. 1064-1065.)

Based on data showing the public currently suffers adverse consequences from imposition of liability for drug manufacturers even under the relaxed comment k test, the court concluded "imposition of a harsher test for liability would not further the public interest in the development and availability of these important products." (*Brown* v. *Superior Court, supra,* 44 Cal.3d at p. 1065.) For all of these policy reasons, the court declined to impose *Barker*'s standard of strict liability on the drug manufacturer for injuries caused by defective design of the prescription drug. (*Ibid.*)

For the same reasons, the court refused to impose strict liability on the drug manufacturer for failing to warn the DES-prescribing physician of alleged defects in the drug that were neither known nor scientifically knowable at the time of distribution. (44 Cal.3d at pp. 1065-1066.) It pointed to California decisions conditioning liability for failure to warn "on the actual or constructive knowledge of the risk by the manufacturer as of the time the product was sold or distributed." (*Ibid.*) It found such a rule "consistent with comment j to section 402A, which confines the duty to warn to a situation in which the seller 'has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge of . . . the danger.'" (*Id.* at p. 1066.)[5]

In summary, *Brown* holds: "[A] manufacturer is not strictly liable for injuries caused by a prescription drug so long as the drug was properly prepared and accompanied by warnings of its dangerous propensities that

---

[5]As we have already noted, the Supreme Court's post-*Brown* decision in *Anderson* v. *Owens-Corning Fiberglas Corp., supra,* 53 Cal.3d 987, 1000, established knowledge or knowability as a component of strict liability for failure to warn, regardless of the nature of the product. (*Ibid.*) In doing so, it observed: "California is well settled into the majority view that knowledge, actual or constructive, is a requisite for strict liability for failure to warn and . . . *Brown* . . . if not directly, at least by implication, reaffirms that position." (*Ibid.*)

were either known or reasonably scientifically knowable at the time of distribution." (*Brown* v. *Superior Court, supra*, 44 Cal.3d at 1069.) *Brown* does not exempt a drug manufacturer from strict liability for manufacturing defects or from liability for negligence or failure to warn of known or reasonably knowable side effects. (*Id.* at p. 1069, fn. 12.)

IV

BROWN'S EXCEPTION TO STRICT LIABILITY FOR DESIGN DEFECTS APPLIES TO MANUFACTURERS OF IMPLANTED MEDICAL DEVICES

Before discussing the considerations that lead us to extend *Brown*'s strict liability exception to implanted medical devices, we acknowledge the case here differs from *Brown* in certain respects. According to *Brown*, there is a 30-year history of virtually universal concern over strict liability in the context of the prescription drug industry, but here we can ascertain no equivalent long-standing or widespread concern about the IPP in particular or about implanted medical devices in general. Additionally, *Brown* points to nearly unanimous judicial endorsement of the comment k standard for drug manufacturers.[6] AMS has cited us only to a depublished California case,[7] an unpublished district court decision, *Albro* v. *American Medical Systems, Inc.* (N.D.Cal. 1989) Docket No. C-89-1745 EFL, and *Terhune* v. *A. H. Robins Co.* (1978) 90 Wn.2d 9 [577 P. 2d 975] to show that comment k's test should apply to implanted medical devices. We have reviewed *Terhune*, a failure to warn case that mentions, but does not discuss, Washington's utilization of the comment k test for the Dalkon Shield. *Terhune* is of no help to our analysis. Finally, the *Brown* court found the design defect "consumer expectation" test inapplicable to prescription drugs (*Brown* v. *Superior Court, supra*, 44 Cal.3d at p. 1061), but we believe the "ordinary consumer" might have a reasonable expectation that a medical device such as a penile prosthesis will function safely when used as intended. (*Barker* v. *Lull Engineering Co., supra*, 20 Cal.3d at p. 430.)[8]

---

[6]"We are aware of only one decision that has applied the doctrine of strict liability to prescription drugs. (*Brochu* v. *Ortho Pharmaceutical Corp.* (1st Cir. 1981) 642 F.2d 652, 654-657.)" (*Brown* v. *Superior Court, supra*, 44 Cal.3d at p. 1060.)

[7]We take note of AMS's improper citing of and reliance on a depublished opinion, in support of its argument that FDA approval of a product means as a matter of law the product is not defective. California Rules of Court, rule 977(a) provides: "An opinion that is not ordered published shall not be cited or relied on by a court or a party in any other action or proceeding except as provided in subdivision (b)." None of the exceptions of subdivision (b) is applicable here. AMS's discussion of the case is inappropriate and we do not consider it.

[8]We are aware the manufacturer markets the product through physicians and discharges its duty to warn by giving them information of risks and dangers. (*Carmichael* v. *Reitz, supra*, 17 Cal.App.3d at p. 989.) However, that is not necessarily determinative of the consumer

The differences between *Brown* and this case, however, do not mandate rejection of the comment k standard. Indeed, we find the important considerations underlying *Brown* apply with equal force to implanted medical devices which, like prescription drugs, are available only through a physician and can save lives or reduce pain and suffering. Such products are commonly crucial to the well-being of the patient. Some devices are so important that, as is the case with prescription drugs, the patient faces death without them. (See, e.g., *Khan* v. *Shiley, Inc.* (1990) 217 Cal.App.3d 848, 850 [266 Cal.Rptr. 106] [patient told she would die in six months without an artificial heart valve].) Other devices, such as the intrauterine device, provide important family planning benefits and may have direct or indirect effects on the patient's physical, mental or emotional health as well. Still other devices, such as the penile prosthesis here, serve the salutary purposes of restoring a degree of normalcy to the lives of those who suffer organic dysfunctions and an impaired quality of life. The IPP facilitates sexual intercourse for the impotent male.[9]

*Brown* distinguishes prescription drugs from "other important medical products (wheelchairs, for example)," on the basis that "harm to some users from prescription drugs is unavoidable." (*Brown* v. *Superior Court, supra,* 44 Cal.3d at p. 1063.) We perceive the risks attendant to implanted medical devices are akin to those of prescription drugs. Just as drugs and vaccines are injected or ingested into the body, implant devices must be "plugged in" to the individual, to work their effect upon or respond to complex systems imperfectly understood by medical science. Just as with drugs and vaccines, the result may be dependent upon the peculiar physical characteristics of the individual, as is graphically illustrated in this case, where Hufft's IPP malfunctioned only because of his extraordinary abdominal musculature. The surgical implantation process itself poses the potential of harm, as does the equally invasive removal process which will be required in some cases. Thus, when distinctions are made among medical products, implanted medical devices must be placed in a category with prescription drugs, not

expectations issue. We have little doubt the general public shares a common knowledge that the penile prosthesis and other implanted medical products offer cosmetic changes. The consumer's reasonable expectations are not confined to those arising from information disseminated by the manufacturer or distributor of the product.

[9]It is irrelevant to our analysis whether a patient has obtained a penile prosthesis for procreation, alleviation of an impotency problem or cosmetic purposes. In its adoption of the comment k rule for prescription drugs, the *Brown* court expressly disapproved *Kearl* v. *Lederle Laboratories, supra,* 172 Cal.App.3d 812, with its case-by-case approach. (*Brown v. Superior Court, supra,* 44 Cal.3d at p. 1061.) In light of *Brown*'s instruction, it would be inappropriate for us to consider the patient's subjective motivation for having an implant.

wheelchairs or other important items that are of comfort or assistance to patients, but do not become an integrated part of the person.[10]

The *Brown* court observed that even though a medical product with dangerous side effects may fairly be "characterized" as defectively designed, strict liability should apply only if it would serve the public interest. (*Brown* v. *Superior Court, supra,* 44 Cal.3d at p. 1062.) We believe the public's interest in development, availability and affordability of medical devices demands rejection of strict liability and adoption of the comment k standard. As with prescription drugs, the harsher rule of strict liability may discourage manufacturers from researching and marketing new medical devices due to realistic fear of substantial adverse judgments, the high cost of strict liability insurance and the uncertainty that such insurance will even be available. (*Id.* at p. 1063.) The costs involved may well place the products "beyond the reach of those who need [them] most." (*Ibid.*) Public interest is served, rather than thwarted, by relieving the manufacturer of strict liability for injuries resulting from implanted medical devices that have been properly fabricated and marketed.[11]

*Brown* teaches that we should eschew engaging in a case-by-case risk/benefit analysis to ascertain whether comment k should or should not apply because to do so would diminish the benefit of comment k's negligence standard. (*Brown* v. *Superior Court, supra,* 44 Cal.3d at p. 1069, fn. 11.) Therefore, we do not compare the IPP to a heart valve or decide whether it is unavoidably unsafe or whether it provides an exceptionally important benefit. *Brown* tells us that in a world of trade-offs, society is well served by restricting available avenues of monetary recovery in exchange for increasing availability of life-saving, suffering-alleviating products. That policy applies to medical devices and prescription drugs alike. Following *Brown*'s lead, we draw a bright line within which the comment k test is applied to all implanted medical devices. We hold that a manufacturer is not strictly liable for injuries caused by an implanted prescription medical

---

[10]For the same reasons, implanted medical devices, which require a physician's prescription and have the potential for saving lives or easing suffering, are to be distinguished from commercial products which, as the *Brown* court observed, are "used to make work easier or to provide pleasure." (*Brown* v. *Superior Court, supra,* 44 Cal.3d at p. 1063.)

[11]In *Stangvik* v. *Shiley, Inc.* (1991) 54 Cal.3d 744 [1 Cal.Rptr.2d 556, 819 P.2d 14], a forum non conveniens case involving heart valves, the Supreme Court resolved a conflict in the appellate courts about factors the trial court may consider in determining the adequacy of the alternative forum. In a passing comment, the court noted there was evidence Sweden and Norway "might permit recovery under a strict liability theory . . . ." (*Id.* at p. 754.) *Stangvik*'s inference, and the inference of the two conflicting cases it discusses, is that California allows strict liability for implanted medical devices. We do not perceive the court's offhand observations in *Stangvik* to constitute an impediment to application of the comment k standard to medical devices.

product which has been (1) properly made and (2) distributed with information regarding risks and dangers of which the manufacturer knew or should have known at the time.

## V

### AMS WAS NOT ENTITLED TO SUMMARY JUDGMENT

Having decided that *Brown* relieves AMS of strict liability for design defects, we turn to the moving papers to determine whether AMS carried its burden of demonstrating (1) the IPP was properly manufactured, and (2) it was marketed with warnings to the physicians of dangers either known to AMS or knowable at the time of distribution. AMS's uncontradicted evidence, standing alone and including reasonable inferences to which it gives rise, must be sufficient to sustain a judgment in its favor. (*Kallen* v. *Delug* (1984) 157 Cal.App.3d 940, 948 [203 Cal.Rptr. 879].)[12] ■ "The moving party's affidavits are to be strictly construed, . . . and doubts as to the propriety of the motion are to be resolved against the moving party. Similarly, all conflicts in the affidavits are to be resolved in favor of the opposing party and all reasonable inferences are to be drawn in favor of that party as well. Mere conclusions of law or fact are insufficient to satisfy the evidentiary requirements for a summary judgment statute, nor may it be based upon inferences which are contradicted by other inferences." (*Perkins* v. *Howard* (1991) 232 Cal.App.3d 708, 713 [283 Cal.Rptr. 764], citations omitted.)

AMS presented the declaration of Mikulich, who stated the IPP, an AMS 700 CX, utilizes a reservoir containing a fluid for inflating cylinders implanted in the penis. The reservoir is implanted behind the abdominal muscles and connected by tubing to a pump implanted in the scrotum. The pump, in turn, is connected by tubing to the penile cylinders. Inflation of the cylinders produces rigidity and an increase in penile girth, similar to a natural erection.

Mikulich said the FDA oversees and reviews every aspect of marketing of the IPP, a class III medical device under the Food, Drug & Cosmetic Act,

---

[12]Code of Civil Procedure section 437c, subdivision (c) does not authorize the trial court to grant summary judgment where contradictory inferences raise a triable issue as to any material fact. (6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 302, pp. 597-598.) In its brief, AMS urges us to consider only matters raised by Hufft at the summary judgment hearing. However, in our review, we must apply the same standards as were required of the trial court, and thus we consider all inferences, regardless of Hufft's failure to note them below. (*Girard* v. *Ball* (1981) 125 Cal.App.3d 772, 781 [178 Cal.Rptr. 406].)

title 21 United States Code section 301 et seq.[13] The agency has never refused AMS permission to market the IPP or found fault with the labeling and product literature which AMS distributes to medical professionals. AMS product literature attached as an exhibit to the Mikulich declaration warns: "Surgical, physical, psychological, or mechanical complications, if they occur, may necessitate revision or removal of the prosthesis." Listed precautions identify potential mechanical complications such as "malfunction of the pumping mechanism or cylinder, tubing kinks, and leakage of fluids."

 ██ ██ Mikulich further attested AMS "makes a concerted and conscientious effort to ensure that known risks and complications associated with the IPP are disseminated to the implanting surgeon," and informational services have been available at all relevant times.[14] Finally, Mikulich stated Hufft's IPP was subjected to nondestructive testing at an AMS facility approximately two years after it was removed. The device's reservoir was fully functional and the pump performed well within specifications.

Other relevant evidence submitted in support of AMS's motion for summary judgment consisted of excerpts from the deposition testimony of two of Hufft's physicians.[15] Marcel Horowitz, M.D., a codefendant surgeon who performed Hufft's original IPP implantation, testified he had no independent recollection of presurgical conversations with Hufft, but it was his custom to advise patients the IPP "produces the erection with the greatest degree of girth, likely with the greatest degree of rigidity, and that [it] was, in [his] opinion, the 'Cadillac of the industry.' "[16] Horowitz further informed patients there were unspecified disadvantages with "tubing connections," and surgical repairs to the device could predictably be required in about five years.

John Prince, M.D., the physician who performed Hufft's remedial surgeries, spoke of his custom and practice of advising implant patients of the

[13]Class III devices are subject to premarket agency approval for a number of reasons, including potential unreasonable risk of injury and insufficient information to determine safety and effectiveness. (21 U.S.C. § 360c.)

[14]A medical product manufacturer fulfills its duty to warn of risks by providing adequate information to the physician. (*Carmichael* v. *Reitz, supra,* 17 Cal.App.3d at p. 989.) As will be seen, there are no facts establishing adequacy of the information provided.

[15]AMS presented portions of Hufft's own deposition testimony relating to three topics: Hufft's health history, the causes of his inability to maintain a natural erection and the problems he encountered with the IPP. The first two topics are irrelevant to our analysis, and we have already discussed the third.

[16]This testimony may well support an inference that the "promotional features of communications to the doctors by the manufacturer" may have "unfairly and unreasonably" predominated, rendering otherwise adequate warnings inadequate. (*Carmichael* v. *Reitz, supra,* 17 Cal.App.3d at p. 989.) Whether warnings are adequate is ordinarily an issue for the fact finder. (*Id.* at p. 991.)

possibility of malfunction of the device, as well as unspecified potential risks and complications known to occur with the IPP. Prince also stated that when he first removed Hufft's IPP, all of the components performed as intended and the prosthetic system "looked perfectly normal." Following Hufft's third revision surgery, Prince concluded Hufft's spontaneous erections resulted not from a defect in the product, but from a tissue capsule that formed around the reservoir implanted in Hufft's abdomen, causing an "inordinate amount of intra-abdominal pressure during normal activity." Prince advised Hufft to change to a penile prosthesis which did not require the implantation of any materials in the abdomen.

Distilling AMS's evidence, we find the only facts presented regarding the IPP are: it was FDA regulated and approved; it was accompanied by literature warning the physician in the most general terms conceivable that "surgical, physical, psychological, or mechanical complications" might occur; informational services of an unspecified nature were available to physicians at relevant times; the IPP "looked perfectly normal" when Hufft's physician examined it during one of the corrective surgeries; the IPP's reservoir and pump performed according to product specifications when the device was tested two years after Hufft had it removed; a tissue capsule formed around the reservoir implanted in Hufft's abdomen.[17]

Obviously the IPP did not function properly, at least while it remained implanted in Hufft, and just as obviously, the IPP caused Hufft a painful and embarrassing injury. AMS presented no evidence the product was not intended for implantation if the patient's abdomen was well-muscled. The literature does not contain any specific warning of the risk of spontaneous, continuing erection. The Mikulich declaration does not say that AMS ever informed implanting surgeons of the risk that materialized in this instance, i.e., that malfunction could result in a continual, painful erection. Horowitz did not testify that he told Hufft or any other patient of the risk of constant erection. Prince did not testify that he informed Hufft of the risk of spontaneous erections. AMS did not show it advised implanting physicians of any contraindications, yet it asserts that malfunction of the device was caused by Hufft's extraordinary abdominal musculature. Nowhere is there evidence AMS advised the physicians to whom the product was distributed that implantation might cause scar tissue to encapsulate the reservoir, preventing the drainage of fluid from the penile cylinders. Nor did AMS show the risk

---

[17]AMS additionally offered opinions and conclusions about its "concerted and conscientious effort" to advise physicians of known risks and complications of the IPP, about the IPP being the "Cadillac of the industry," and about the malfunction of the IPP being attributable to Hufft's idiosyncratic "intra-abdominal pressure" rather than product defect. "Generalities and conclusions will not suffice in the moving party's declarations." (*Lerner* v. *Ehrlich* (1963) 222 Cal.App.2d 168, 172 [35 Cal.Rptr. 106].)

of occurrence of that problem is so negligible that a specific warning need not be given. It offered no facts about the state of its knowledge of risks or the state of knowledge of the community at the time of distribution of the product. This is a representative but less than complete recitation of the shortcomings of AMS's evidence.

As we have said, even under the relaxed standard of *Brown*, in order to prevail AMS had to demonstrate conclusively that the IPP was (1) properly manufactured and (2) distributed with adequate instructions or warnings of its potential for harm. It met its burden with regard to proper manufacture. Hufft's physician said that when he removed the IPP, he examined it; all of the components performed as intended and the prosthetic system "looked perfectly normal." He also stated his opinion that Hufft's problem resulted not from a product defect, but from tissue encapsulation of the reservoir. Additionally, AMS's vice-president of research and development stated Hufft's IPP was tested some two years later, at which time the device's reservoir was fully functional and the pump performed well within specifications. This uncontradicted evidence gave rise to only one reasonable inference: that the IPP was properly manufactured.

■ However, as outlined in detail above, AMS failed to establish facts demonstrating the warnings which accompanied the IPP were adequate; it did not even lay a foundation for such a showing. It failed to tell the court what it knew about the danger of the injury encountered by Hufft, and when it knew it. We therefore conclude AMS was not entitled to judgment in its favor on Hufft's failure to warn claim.

We need not determine whether the judgment was improvidently granted in other respects. Summary judgment is improper unless the moving party negates every alternative theory of liability presented by the pleadings. (*Bell v. Industrial Vangas, Inc.* (1981) 30 Cal.3d 268, 271, fn. 1 [179 Cal.Rptr. 30, 637 P.2d 266].) We note, for guidance of the trial court, AMS failed to negate Hufft's negligence or breach of warranty claims because it failed to put on conclusive evidence regarding its actual or constructive knowledge of dangers of the IPP at the time of distribution. As for negligence, the record does not support AMS's contention it established facts showing its due care in marketing the IPP.[18] *Brown* states that even where comment k applies, manufacturers may be subject to liability for negligence. (*Brown v. Superior Court, supra,* 44 Cal.3d at p. 1069, fn. 12.)

---

[18]When Hufft's IPP was removed, it was replaced with a penile prosthesis that did not require implantation. This raises an inference a safer product was on the market, which could give rise to the further inference that AMS was negligent in continuing to market its product. The record is silent in this respect.

With regard to breach of warranty, AMS paid scant attention to the subject in its moving papers and was equally uninterested in cogent discussion in its brief on appeal. Under *Brown, supra*, breach of express or implied warranty claims, like design defect claims, may not be maintained against a manufacturer of prescription drugs who has properly prepared the product and marketed it with warnings of known or knowable dangers. (44 Cal.3d at p. 1072.) In deciding that issue, the *Brown* court reasoned: "We have concluded above that a manufacturer of prescription drugs is not strictly liable for injuries caused by [a design] defect that is neither known nor knowable at the time the drug is distributed. To hold nevertheless that the manufacturer's representation, express or implied, that a drug may be prescribed for a particular condition amounts to a warranty that it is 'fit' for and will accomplish the purpose for which it is prescribed (Cal. U. Com. Code, §§ 2314, subd. (2)(c), 2313, subd. (1)(a)), and to allow an action for personal injury for the breach of such warranties, would obviously be incompatible with our determination regarding the scope of a drug manufacturer's liability for product defects." (*Brown* v. *Superior Court, supra*, 44 Cal.3d at p. 1072.) Here, AMS did not prove the danger that materialized in Hufft's case was unknown or unknowable at the time. Thus, it did not negate Hufft's breach of warranty claims. Should Hufft establish at trial that AMS marketed the IPP without warnings of dangers of which it knew or should have known, avenues of recovery for breach of express or implied warranty will remain open to him.

The judgment is reversed and the case remanded for further proceedings in accordance with this opinion. Appellant to recover his costs on appeal.

Sills, P. J., and Crosby, J., concurred.