[No. E009093. Fourth Dist., Div. Two. Nov. 30, 1992.]

JOHN PLENGER et al., Plaintiffs and Appellants, v.
ALZA CORPORATION, Defendant and Respondent.

**COUNSEL**

Girardi, Keese & Crane, Robert M. Keese and James B. Kropff for Plaintiffs and Appellants.

Kolts & Nawa, Raymond G. Kolts and Kathlene Landgraf Kolts for Defendant and Respondent.

## OPINION

**HOLLENHORST, J.**—Plaintiffs in a wrongful death action appeal from the summary judgment entered in favor of defendant, Alza Corporation, after the trial court determined as a matter of law that the intrauterine device (IUD) manufactured by Alza was a prescription drug within the meaning of *Brown* v. *Superior Court* (1988) 44 Cal.3d 1049 [245 Cal.Rptr. 412, 751 P.2d 470] and that the warnings given by Alza to the physician were adequate as a matter of law.

### FACTS

Barbara Plenger died on October 21, 1985. The autopsy showed that the cause of death was an infection caused by the insertion of an IUD. Plaintiffs, decedent's husband and daughter, filed this action for wrongful death alleging one cause of action for medical malpractice against Family Planning Associates Westend Medical Group and a cause of action against Alza, the manufacturer of the IUD for product liability. In their action against Alza, plaintiffs alleged that the IUD was "defective and unsafe for its intended purpose in that it caused injury and death to the plaintiffs' decedent, Barbara Plenger."

Four years after the action was filed, Alza moved for summary judgment or in the alternative summary adjudication of issues. Although its separate statement of undisputed material facts identifies 32 "facts,"[1] essentially, the basis of Alza's motion was (1) the IUD did not contain a manufacturing defect; (2) the IUD is a prescription drug within the meaning of *Brown* v. *Superior Court, supra,* 44 Cal.3d 1049 which precludes strict product liability for design defect; and (3) the warnings given by Alza to the physician were adequate as a matter of law.[2]

Attached as evidence to the motion was the declaration of Dr. David A. Grimes, a board certified gynecologist. Dr. Grimes declared that, after review of various medical records of the decedent, he was of the opinion that

---

[1]In actuality some of the points included in the separate statement of undisputed facts and characterized as "material facts" are either *legal* contentions (see No. 31 and No. 32) or are not *material* (Nos. 1, 2, 3, 8, 9, 10, 11, 13, 15).

[2]Alza presented evidence in support of its motion for summary judgment that the cause of death was not the infection but rather that the decedent died from aspirin poisoning. Ordinarily this basic factual dispute regarding causation would preclude a grant of summary judgment. Here, however, Alza's alternative basis for moving for summary judgment is premised on an assumption that the cause of death was in fact the insertion of the IUD. On that assumption, Alza contended it was not liable because its warnings were adequate as a matter of law and under *Brown* v. *Superior Court, supra,* 44 Cal.3d 1049, Alza is not liable under strict product liability.

the decedent died of chronic aspirin poisoning which was unrelated to the insertion of the IUD.

He further declared that in 1985 it was general medical knowledge that insertion of an IUD might cause a pelvic abscess or an infection and that "[i]n its literature, Alza Corporation specifically and accurately warned of (amongst other things) pelvic infections, intrauterine embedment, perforation into the abdomen, intestinal penetration, cystic masses in the pelvis and septicemia" and "the warnings and labeling given to the physician by Alza Corporation discusses at length the possibility of pelvic inflammatory disease as the result of the insertion and use of IUDs." In his opinion, "both the physician and patient materials provide sufficient and adequate information to the general medical community regarding the risks, uses and possible adverse reactions associated with the Progestasert IUD." Finally he declared that in his opinion the IUD manufactured by Alza "was a safe, effective and proper design for an IUD product, and one that has been prescribed and used extensively in the United States."

Carol Hartenstein, director of quality assurance and former manager of quality assurance for Alza, also submitted a declaration in support of the motion. Therein she stated that Alza's Progestasert IPCS IUD is a prescription drug product which includes the IUD, its inserter, packaging and labeling. The testing, manufacturing and sale of the product are regulated by the Food and Drug Administration (FDA) which approved Alza's clinical data regarding the safety and efficacy of the product, the specifications for the product and its labeling as well as the manufacturing and quality control requirements.

The IUD is manufactured in strict compliance with the specifications approved by the FDA and Alza is regularly inspected by not only the FDA but also the California State Department of Health and Human Services to assure compliance. Alza has never been required to stop manufacturing the IUD or to recall any lots. The product is sold only to health care providers and has never been sold directly to the patient.

Alza additionally attached copies of plaintiffs' responses to Alza's request for admissions propounded in April of 1990 wherein plaintiffs admitted the decedent consulted with defendant, Family Planning Associates for the first time on January 5, 1985. Decedent had had a previous IUD, had "irritation only after 12 years," and desired to use an IUD as her contraceptive device. Decedent had an IUD inserted on April 17, 1985. She signed a patient consent for insertion of IUD which stated that she had "been informed of the possible risks and benefits of an IUD and that the use may be hazardous to

[her] health or future fertility" and that she had "been advised and understand the importance of notifying the clinic if [she could not] locate [her] IUD string, if [she had] prolonged or excessive cramping or bleeding, or signs of infection—pelvic pain, fever, and/or bad smelling discharge, or if there seem[ed] to be any possibility that [she was] pregnant."

Plaintiffs denied certain other requests for admission relating to the adequacy of the warnings, the absence of manufacturing defect, the absence of any design defect and further denied that their sole basis for contending that the IUD was defective was that the IUD caused a severe infection to decedent's pelvis. Plaintiffs explained that these requests for admission were denied because plaintiffs were "in the process of conducting discovery as to the defective condition of the I.U.D." and pointed to "Mrs. Plenger's Autopsy Report which concludes the I.U.D. was a cause of death as proof of defect."

In supplemental responses to the interrogatories dated in June of 1990, plaintiffs stated its was their contention that the IUD was "defective in its manufacture because the IUD's performance differed from the manufacturer's intended result; because the IUD failed to perform as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; and, because defendant Alza failed to fully and adequately warn of the dangers and risks of using the IUD." Similarly it was their contention the IUD was "defective in its design because it failed to perform as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; because the risk of danger in the IUD outweighed the benefits of the IUD; and, because defendant Alza failed to fully and adequately warn of the dangers and risks of using the IUD." Plaintiffs admitted that they had "no evidence at present of a specific manufacturing defect" or "a specific design defect."

A single page from the deposition of Dr. Terrence Allen was also attached in support of the motion. On that page, the doctor was asked "Are you of the opinion that the IUD that you observed in Barbara Plenger was defective" He responded, "No, I'm not."

Also attached in support of the motion were copies of the physician package insert which was included in each package of six IUD's and the patient information sheet which was also included in each package of IUD's.

In opposition to the motion for summary judgment, plaintiffs submitted the declaration of Dr. Robert J. Futoran who specializes in obstetrics and gynecology and is a diplomate of the American Board of Obstetrics and

Gynecology. In his opinion, the patient information sheet and the physician package insert produced and distributed by Alza "provide insufficient and inadequate information to the general medical community regarding the risks, uses and possible adverse reactions associated with the Progestasert IUD. Specifically, the package insert does not inform of the risk of infection resulting in death from the implantation and use of the Progestasert IUD. In that respect, the 1985 package materials did .not provide sufficient and adequate information regarding infections, perforations and all other known risks of Progestasert IUD use."

Also attached were additional pages from Dr. Allen's deposition wherein he explained and reiterated his opinion that the cause of death was the pelvic abscess caused by an infection in the fallopian tube which in turn was caused by the insertion of the IUD. Based on the degree and extent of inflammation, he estimated that the abscess had been present for four to ten days. Although not a cause of the decedent's death, Dr. Allen believed another important factor in her death was "rheumatoid arthritis," "the chronic debilitating nature of that disease and the loss of the decedent's natural resistance in association with medications that she had received for that disease."

Dr. Allen stated that he believed a reasonable medical probability the IUD caused the pelvic abscess was proven by the lack of any other adequate explanation for the pelvic abscess, the finding of the abscess in association with the IUD and "the well-known epidemiological association of intrauterine devices and infections." The IUD caused the infection, in his opinion, by affecting the natural resistance of the uterus and by allowing bacteria to enter from the vagina through the uterus into the fallopian tube. The IUD alters the body's natural resistance to infection by provoking the foreign body response in the uterus. He did not believe that this was unique to any particular IUD but rather applied to IUD's in general although some IUD's could be worse. His opinion that some IUD's may be worse was based on the fact that IUD's have been modified and that there are numerous models and designs. This led him to believe that the modifications were intended to increase the safety of the IUD including safety from infection.

Alza's monograph which details the clinical studies performed by Alza was also submitted as well as an article from the July 1983 edition of the Journal of the American College of Obstetricians and Gynecologists entitled *Type of Intrauterine Device and the Risk of Pelvic Inflammatory Disease.*

In their statement of undisputed facts, plaintiffs disputed Alza's contention that the IUD was properly manufactured and was not defectively manufactured and submitted as evidence (1) Alza's answer to an interrogatory requesting Alza to identify all tests performed by Alza to determine if the

IUD contained defects wherein Alza stated among other things that "Quality control testing was performed on raw materials and at stages throughout the manufacturing process. Returned goods were also tested."; and (2) evidence that one of the arms of the IUD was "broken."[3]

Plaintiffs also disputed Alza's contention that the IUD was not defectively designed. In support thereof, plaintiffs referred to (1) the death certificate which lists the insertion of IUD as one of the causes of death; (2) Alza's answer to interrogatory stating there have been no changes or alterations to the product; (3) page 29 of Alza's monograph which states "The incidence of reported pelvic inflammatory disease during the trials was less than 4 per 100 women per year; the incidence of confirmed cases was about half this"; (4) paragraph 4 of page 22 (d) of the monograph pertaining to peritoneal irritation studies in rabbits which stated that in the group with the noncopper IUD's, "the inflammatory reactions were slower to occur and less severe in nature," with "slight to thick fibrous encapsulation was present" and no necrosis or abscesses occurred; and (5) page 31 of the monograph which indicates 3.7/100 women reported pelvic inflammatory disease.

As noted previously, in disputing Alza's contention that the warnings were adequate, plaintiffs submitted Dr. Futoran's declaration, the physician package insert and additional selected passages from Alza's monograph regarding the incidence of pelvic inflammatory disease.

In reply, Alza submitted a supplemental declaration from Dr. Grimes and a declaration from Dr. M. Gail Vanderlee to the effect that the risk of death from any infection left untreated is a "basic . . . medical principle" and "was universally known in the medical community in 1985 and is considered elemental medical knowledge."

Based on this evidence and the legal argument on whether the IUD in question is a drug or product, the court granted the motion for summary judgment. The trial court ruled the IUD is a prescription drug and therefore liability was governed by *Brown* v. *Superior Court, supra,* 44 Cal.3d 1049, and that the warnings given to the physician were adequate. Plaintiffs filed a timely notice of appeal.

## STANDARD OF REVIEW

■ When reviewing summary judgment, we independently analyze the construction and effect of the supporting and opposing papers. (*AARTS*

---

[3]The statement of undisputed facts does not actually state that the arm was broken and the page from the autopsy report which shows a drawing of the IUD has a handwritten notation which states "this arm *cut* by me during remove [*sic*] corresponds to side of infection." The contention that the arm of the IUD "broke upon removal at the autopsy" is contained in plaintiffs' opposition to the motion for summary judgment.

*Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) In so doing, we apply the same analysis required of the trial court. (Code Civ. Proc., § 437c; *AARTS Productions, Inc.* v. *Crocker National Bank, supra,* 179 Cal.App.3d 1061, 1064-1065.) ■ When the defendant moves for summary judgment, he must either disprove at least one essential element of every cause of action or prove an affirmative defense that would bar every cause of action in the complaint. (*Conn* v. *National Can Corp.* (1981) 124 Cal.App.3d 630, 637-639 [177 Cal.Rptr. 445].)

If any triable issue of fact exists, it is error for the trial court to grant a motion for summary judgment. (*Schrimscher* v. *Bryson* (1976) 58 Cal.App.3d 660, 663 [130 Cal.Rptr. 125].) Because of the drastic nature of the procedure, all doubts should be resolved in favor of the party opposing the motion. (*Powell* v. *Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357, 362 [212 Cal.Rptr. 395].)

## DISCUSSION

At the heart of the parties' dispute is the applicability of *Brown* v. *Superior Court, supra,* 44 Cal.3d 1049. ■ Plaintiffs contend that *Brown* is limited to prescription drugs and therefore with respect to a product which is at best both a drug and a device, *Brown* does not preclude an action for product liability based on design defect when the injury is caused by the mechanical or "device" aspect of the IUD. Defendants contend first the IUD is a drug, and secondarily, even if it is not classified as a drug, the reasoning of *Brown* applies. We therefore begin our discussion with a review of *Brown.*

In *Brown,* plaintiffs filed suit against manufacturers of diethylstilbestrol (DES), a drug used by plaintiffs' mothers to prevent miscarriage, alleging that the drug was defective. The issue before the Supreme Court was whether the trial court erred in its pretrial ruling that defendants could not be held strictly liable for the alleged design defect but only for their failure to warn of known or knowable side effects of the drug. The Supreme Court held that a manufacturer of a prescription drug could not be held strictly liable under a design defect theory.

In reaching this determination, the court held first that the consumer expectation theory of design defect, i.e., whether the product performed as safely as the ordinary consumer would expect when used in an intended and reasonably foreseeable manner, was particularly unsuitable for prescription drugs. "While the 'ordinary consumer' may have a reasonable expectation that a product such as a machine he purchases will operate safely when used

as intended, a patient's expectations regarding the effects of such a drug are those related to him by his physician, to whom the manufacturer directs the warnings regarding the drug's properties. The manufacturer cannot be held liable if it has provided appropriate warnings and the doctor fails in his duty to transmit these warnings to the patient or if the patient relies on inaccurate information from others regarding side effects of the drug." (*Brown v. Superior Court, supra*, 44 Cal.3d 1049, 1061-1062, fn. omitted.)

The court then considered whether the alternate theory of design defect, i.e., whether on balance the benefits of the challenged design outweigh the risk of inherent danger in the design, should be applied to prescription drugs. On this issue defendants again contended that this analysis "is inapposite to prescription drugs" because "there is no possibility for an alternative design for a drug like DES, which is a scientific constant compounded in accordance with a required formula." (*Brown v. Superior Court, supra*, 44 Cal.3d 1049, 1062.)

In rejecting this contention, the court found: "[P]laintiff might be able to demonstrate at trial that a particular component of DES rendered it unsafe as a miscarriage preventative and that removal of that component would not have affected the efficacy of the drug. Even if the resulting product, without the damaging component, would bear a name other than DES, it would do no violence to semantics to view it as a 'redesign' of DES. [¶] Or plaintiff might be able to prove that other, less harmful, drugs were available to prevent miscarriage; the benefit of such alternate drugs could be weighed against the advantages of DES in making the risk/benefit analysis of *Barker*." (*Brown v. Superior Court, supra*, 44 Cal.3d 1049, 1062.)

Having determined that the risk/benefit design defect analysis could be used in prescription drug cases and after conceding that many of the policy reasons underlying strict liability "could justify application of the doctrine to the manufacturers of prescription drugs" (*Brown v. Superior Court, supra*, 44 Cal.3d 1049, 1063), the court nonetheless concluded "there is an important distinction between prescription drugs and other products such as construction machinery . . . the producers of which were held strictly liable. In the latter cases, the product is used to make work easier or to provide pleasure, while in the former it may be necessary to alleviate pain and suffering or to sustain life. Moreover, unlike other important medical products (wheelchairs, for example), harm to some users from prescription drugs is unavoidable. Because of these distinctions, the broader public interest in the availability of drugs at an affordable price must be considered in deciding the appropriate standard of liability for injuries resulting from their use." (*Ibid.*)

When this broader public interest was considered, the court found that imposition of strict liability for design defect could further delay the marketing of new drugs, might prevent research on new drugs, and that the cost

of insuring against such liability may make the cost of the medication "beyond the reach of those who need it most." (*Brown* v. *Superior Court, supra*, 44 Cal.3d 1049, 1063.) Therefore, the court concluded that "(1) a drug manufacturer's liability for a defectively designed drug should not be measured by the standards of strict liability; [and] (2) because of the public interest in the development, availability, and reasonable price of drugs, the appropriate test for determining responsibility is the test stated in comment k [to Restatement Second of Torts section 402A] . . . ." (*Id.*, at p. 1061.)

Under Restatement Second of Torts section 402A, comment k (comment k),[4] the producer of an unavoidably unsafe product is liable only if the manufacturer of the product "failed to warn of a defect of which it either knew or should have known." (*Brown* v. *Superior Court, supra*, 44 Cal.3d 1049, 1059.) The manufacturer of a prescription drug also would remain liable for a manufacturing defect as well as under general principles of negligence. (*Id.*, at p. 1069, fn. 12.)

 Thus, as we read *Brown*, the exemption from strict liability for design defect for prescription drugs is based primarily, if not exclusively, on public policy considerations. It is not, as implicitly contended by plaintiffs, based on any inherent distinction between a drug and a device which makes design defect analysis unworkable with respect to prescription drugs. To the contrary, the *Brown* court expressly disapproved the notion that the risk/ benefit design defect analysis was incompatible with prescription drugs. The question, therefore, is *not* whether the IUD is a prescription drug or a device but rather whether the policy considerations underlying the decision in *Brown* should be applied to IUD's.

---

[4]Comment k states: "*Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

Division Three of this court recently had occasion to address whether the manufacturer of an inflatable penile prothesis should be held liable under a design defect theory of strict liability. (*Hufft* v. *Horowitz* (1992) 4 Cal.App.4th 8 [5 Cal.Rptr.2d 377].) The court determined "the important considerations underlying *Brown* apply with equal force to implanted medical devices, which like prescription drugs, are available only through a physician and can save lives or reduce pain and suffering. Such products are commonly crucial to the well-being of the patient. Some devices are so important that, as is the case with prescription drugs, the patient faces death without them. (See, e.g., *Khan* v. *Shiley, Inc.* (1990) 217 Cal.App.3d 848, 850 . . . [patient told she would die in six months without an artificial heart valve].) Other devices, such as the intrauterine device, provide important family planning benefits and may have direct or indirect effects on the patient's physical, mental or emotional health as well. Still other devices, such as the penile prothesis here, serve the salutary purposes of restoring a degree of normalcy to the lives of those who suffer organic dysfunctions and an impaired quality of life." (*Id.*, at p. 18.)

In reaching this conclusion, the court distinguished implanted medical devices from "other important medical products (wheelchairs, for example)," (*Brown* v. *Superior Court, supra*, 44 Cal.3d 1049, 1063) and found implanted medical devices were more analogous to prescriptions drugs. "Just as drugs and vaccines are injected or ingested into the body, implant devices must be 'plugged in' to the individual, to work their effect upon or respond to complex systems imperfectly understood by medical science." (*Hufft* v. *Horowitz, supra*, 4 Cal.App.4th 8, 18.) Accordingly, "the public's interest in development, availability and affordability of [implanted] medical devices demands rejection of strict liability and adoption of the comment k standard." (*Id.*, at p. 19.)[5]

We as well are unable to make any principled distinction in terms of policy considerations between prescription drugs and prescription implanted medical devices such as the IUD in this case. Further, we believe the distinction drawn in *Hufft* between implanted medical devices and other medical devices and commercial products is consistent with the distinctions drawn in *Brown*. Accordingly, under the comment k standard, Alza is not

---

[5]In *Brown*, the court rejected analyzing prescription drugs on a case-by-case basis to determine if comment k should apply even while conceding that "[i]t seems unjust to grant the same protection from liability to those who gave us thalidomide as to the producers of penicillin." (*Brown* v. *Superior Court, supra*, 44 Cal.3d 1049, 1067.) To analyze prescription drugs on an individual basis would, in the court's opinion, harm the public interest in development and marketing of new drugs as the manufacturer would have no assurance that its product will be measured by the comment k standard. (*Ibid.*) For the same reason, the court in *Hufft* refused to employ a case-by-case analysis for implanted medical devices. (*Hufft* v. *Horowitz, supra*, 4 Cal.App.4th 8, 19.)

strictly liable for injuries caused by the IUD if it (1) was properly manufactured and (2) was distributed with adequate information regarding the risks and dangers of which Alza knew or should have known at the time.

## 1. *Proper Manufacture.*

Alza presented evidence that its manufacturing process, including its specifications, were approved by the FDA and were subject to strict quality control requirements. Alza is regularly inspected by both the FDA as well as the California Department of Health and Human Services and has never been required to stop manufacturing or to recall its products. Although plaintiffs disputed Alza's claim that there is no evidence of a manufacturing defect, they failed to present any evidence demonstrating a triable issue of fact. Plaintiffs argued in their opposition that the arm of the IUD "broke" on removal from decedent's body after death when in fact the very evidence supplied by plaintiffs demonstrates that the arm did not break but rather was *cut* during the autopsy. No triable issue of fact exists on the issue of proper manufacture.

## 2. *Failure to Warn of a Known or Knowable Defect.*

On the issue of the adequacy of the warnings to the physician,[6] Alza presented evidence that its physician package insert which advised of the risk of pelvic infection among other adverse reactions

---

[6]Plaintiffs contend in their *reply* brief that the warnings should be given to the patient and warnings to the physician are not sufficient. Even if the issue were not deemed waived by plaintiffs' failure to raise it in their opening brief, the argument is not well taken. It is well established that a manufacturer fulfills its duty to warn if it provides adequate warning to the physician. (See, e.g., *Davis* v. *Wyeth Laboratories, Inc.* (9th Cir. 1968) 399 F.2d 121, 130; *Fogo* v. *Cutter Laboratories, Inc.* (1977) 68 Cal.App.3d 744, 754 [137 Cal.Rptr. 417]; *Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 989 [95 Cal.Rptr. 381]; *Brown* v. *Superior Court, supra,* 44 Cal.3d 1049, 1062, fn. 9; *Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65-66 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059]: "In the case of medical prescriptions, 'if adequate warning of potential dangers of a drug has been given to doctors, there is no duty by the drug manufacturer to insure that the warning reaches the doctor's patient for whom the drug is prescribed.' ") "The rationale of the foregoing rule is: '(1) The doctor is intended to be an intervening party in the full sense of the word. Medical ethics as well as medical practice dictate independent judgment, unaffected by the manufacturer's control, on the part of the doctor. (2) Were the patient to be given the complete and highly technical information on the adverse possibility associated with the use of the drug, he would have no way to evaluate it, and in his limited understanding he might actually object to the use of the drug, thereby jeopardizing his life. (3) It would be virtually impossible for a manufacturer to comply with the duty of direct warning, as there is no sure way to reach the patient.'. . . [¶] Because of the foregoing law, it is the prescribing doctor who in reality stands in the shoes of 'the ordinary consumer.' " (*Carmichael* v. *Reitz, supra,* 17 Cal.App.3d 958, 989.)

was approved by the FDA.[7] It also presented the declaration of Dr. Grimes who reviewed the patient information sheets and the physician package insert and found both adequate in their warnings of the risk of pelvic infection. He further declared that in 1985, the risk of pelvic infection from the insertion of an IUD was well known in the medical community.

In opposition, Dr. Futoran found the warnings inadequate because they did not specifically advise of the risk of death which can result from a pelvic infection. Were this all the evidence presented, we would be inclined to agree with plaintiffs' contention that a triable issue of fact exists.

■■■■ However, in its reply,[8] Alza submitted a supplemental declaration of Dr. Grimes and a declaration from a Dr. Vanderlee to the effect that the risk of death from any untreated infection was a matter of general and elemental medical knowledge. Plaintiffs do not dispute this.

■ We are aware of no authority which requires a manufacturer to warn of a risk which is readily known and apparent to the consumer, in this case the physician. Further, if the risk of death from untreated infection is universally known in the medical profession, the failure to warn the physician of that risk cannot be the legal cause of the decedent's death. (*Kirsch* v. *Picker International, Inc.* (8th Cir. 1985) 753 F.2d 670, 671-672.) Accordingly, we find there is no triable issue of fact on the adequacy of the warnings.

## DISPOSITION

Judgment affirmed.

Dabney, Acting P. J., and Timlin, J., concurred.

---

[7]"[M]ere compliance with regulations or directives as to warnings, such as those issued by the United States Food and Drug Administration here, may not be sufficient to immunize the manufacturer or supplier of the drug from liability. The warnings required by such agencies may be only minimal in nature and when the manufacturer or supplier knows of, or has reason to know of, greater dangers not included in the warning, its duty to warn may not be fulfilled." (*Stevens* v. *Parke, Davis & Co., supra,* 9 Cal.3d 51, 65.)

[8]Although, the inclusion of additional evidentiary matter with the reply should only be allowed in the exceptional case, the trial court's consideration of such additional evidence is not an abuse of discretion so long as the party opposing the motion for summary judgment has notice and an opportunity to respond to the new material. (*Weiss* v. *Chevron, U.S.A., Inc.* (1988) 204 Cal.App.3d 1094, 1098 [251 Cal.Rptr. 727].) Here, plaintiffs did not object to the new evidence, did not request a continuance, and did not even suggest that additional evidence could be presented on the issue of whether warnings regarding the risk of death from an untreated pelvic infection should have been given to the physician. Similarly, plaintiffs do not claim on appeal that the trial court erred in allowing this new evidence. Accordingly, it is permissible for both the trial court and this court to consider the additional evidence.