Filed 4/27/15  Telecom Network Specialists v. Engineering Network International CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| TELECOM NETWORK SPECIALISTS, INC., <br><br> Cross-complainant and Appellant, <br><br> v. <br><br> ENGINEERING NETWORK INTERNATIONAL, INC. et al, <br><br> Cross-defendants and Respondents. | B250559 <br><br> (Los Angeles County <br> Super. Ct. Nos. BC349267, BC354230) |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, John Shepard Wiley, Jr., Judge.  Reversed.

Sheppard, Mullin, Richter & Hampton, Ronald J. Holland, Ellen M. Bronchetti, and Karin Dougan Vogel for Cross-complainant and Appellant.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Jeffrey S. Ranen and Lann G. McIntyre for Cross-defendant and Respondent Kineticom, Inc.

Hurt & Berry and Jeffrey W. Hurt for Cross-defendants and Respondents Ritesync, Inc. and Dataworkforce, L.P.

Young Zinn & Bate, David H. Bate and Harry A. Zinn for Cross-defendant and Respondent Orin USA, Inc.

Armstrong The Law Firm and Richard L. Armstrong for Cross-defendant and Respondent Datalogix Texas, Inc.

Connor & Sargent and Stephen P. Connor for Cross-defendant and Respondent Engineering Network International, Inc.

Krafchak & Lynch and Stephanie L. Krafchak for Cross-defendant and Respondent Multipoint Wireless, LLC.

_____

Appellant Telecom Network Services (TNS) contracted with numerous staffing agencies to provide technicians who installed and tested telecommunications equipment for TNS's customers. In 2006, a staffing agent technician filed a wage and hour class action against TNS for failure to pay overtime and violations of meal and rest break requirements. The complaint alleged TNS qualified as an employer of every technician who had serviced its clients, including technicians who were hired and paid by a staffing agency.

TNS filed cross-complaints against its staffing agencies for indemnity and breach of contract. TNS alleged that its master services agreement (MSA) with each staffing agency contained an indemnity provision that applied to the claims at issue in the underlying wage and hour litigation. TNS alternatively alleged that the staffing agencies had breached the MSA by failing to pay their employees overtime and comply with meal and rest period requirements, thereby causing the wage and hour action to be filed.

Seven staffing agencies filed motions for summary judgment arguing that the MSA's indemnity provision did not apply to wage and hour claims. They further asserted that TNS's breach of contract claim should be dismissed because it was duplicative of the indemnity claim. The trial court granted the motions and entered judgment in favor of the staffing agencies. We reverse, concluding that the staffing agencies failed to demonstrate they are entitled to judgment on TNS's contract claim.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Summary of TNS's Master Services Agreement*

TNS installs and tests cellular phone telecommunications equipment for its customers. TNS retains the technicians who service its customers either by hiring them directly or through staffing agencies that locate and hire technical personnel. TNS requires every staffing agency to sign an MSA that sets forth the terms and conditions of their labor agreement.[1]

Section 2 of the MSA describes the "scope of the agreement": "From time to time TNS may request that [the staffing agency] provide services necessary for the installation and testing of TNS customers at various sites and locations within . . . the United States. The services requested will be described . . . in [TNS's] Resource Request . . . . [and are] referred to herein as the 'Work.'"

Section 5 describes the parties' payment obligations, which require TNS to pay the staffing agency a pre-set hourly rate for each hour of the technician's labor. The staffing agency technician must enter his or her time into TNS's "Trinity" timekeeping system. The staffing agency then submits an invoice to TNS accompanied by "copies of the time sheets . . . approved by the TNS's designated Site Manager." The staffing agency is "solely responsible and liable for compensating" the technicians. It is also required to maintain "complete and accurate records of all . . . work" performed by its technicians, withhold applicable state and federal taxes and "comply with . . . all [other] applicable federal, state, county and local laws . . . in its performance of all Work . . . including . . . laws relating to labor standards."

Section 8 of the MSA is an indemnification provision stating that the staffing agency will "defend, indemnify and hold harmless TNS [and its customers and agents] from and against an[y] and all liability, damages, losses, claims [etc.] . . . of every nature and kind by reason of injury to or death of any person or damage to or destruction of

---

[1] For the purposes of appeal, the parties agree that every MSA that TNS entered into with a staffing agency contained the same material terms and conditions.

3

property arising out of or incidental to or in any way resulting from the acts or omission of [the staffing agency and its agents] in the performance of the Work, except that the staffing agency shall not be responsible for any such losses . . . caused by the sole negligence or willful misconduct of TNS . . . and TNS shall defend, indemnify and hold harmless [the staffing agency] therefore."

The MSA also includes a choice-of-law clause providing that the agreement "shall be governed and construed under the laws of the state of Texas."

### B. *Summary of the Litigation*

On June 27, 2006, plaintiff Lorenzo Benton filed a class action complaint (the Benton action) against TNS and the staffing agency that hired him alleging violations of California wage and hour laws, including: failure to pay overtime (Labor Code, §§ 510, 1194; Cal. Code Regs., tit. 8, § 11040, subd. (3)); failure to provide adequate meal and rest breaks (§§ 226.7, 512; Cal. Code Regs., tit. 8, § 11040, subds. (11) & (12)); failure to furnish accurate wage statements and maintain accurate payroll records (§§ 226, 226.3, 1174, 1174.5; Cal. Code Regs., tit. 8, § 11040, subd. (7)); and unfair business practices. (Bus. & Prof. Code, § 17200.)

The operative second amended complaint, which named only TNS as a defendant, sought to represent a class "consist[ing] of all persons who provided skilled technical labor for the benefit of TNS's [c]ustomers through TNS where the work was performed in California within . . . [the c]lass period . . . ." The complaint alleged that every technician "hired to perform work for TNS's [c]ustomers, either directly or through [staffing agencies], were TNS's employees, regardless of whether they may have also been the employees of the [staffing agencies]." The complaint further alleged that "[n]either TNS nor its agents paid overtime" or "had any policy of providing meal breaks [or rest] breaks to the workers as required by California law."

In November of 2007, TNS filed substantially identical cross-complaints against every staffing agency that had provided a technician who fell within the "class of workers

4

defined in the Benton action."[2]  Each cross-complaint asserted that the MSA required the staffing agency to compensate its technicians for overtime and to comply with all federal and state labor laws "in its performance of the Work" for TNS.  The cross-complaint further alleged that "the damages asserted [in] the [Benton action] arose out of [the staffing agency's] performance of its obligations under the [MSA]."

TNS alleged three causes of action:  express indemnity, implied indemnity and breach of contract.  The express indemnity claim alleged that section 8 of the MSA required each staffing agency to defend and indemnify TNS against the wage and hour claims at issue in the underlying Benton action.  The equitable indemnity claim alleged that even if the Benton claims did not fall within section 8 of the MSA, TNS was nonetheless entitled to "apportionment of liability and contribution from" each staffing agency for any damages the Benton class might recover.[3]

TNS's contract claim alleged each staffing agency had "breached" the MSA by "failing to comply with the provisions of all applicable federal and state laws . . . in connection with the work performed under the [MSA]."  TNS contended that the Benton action had been filed "as a direct and proximate result" of the staffing agency's breach and that the damages sought in that underlying action were likewise "attributable to [the] breach."

### C. *Respondents' Motions for Summary Judgment*

    *1.  Summary of the respondents' motions for summary judgment or, in the alternative, summary adjudication*

Seven staffing agencies (Ritesync, Multipoint Wireless, Datalogix, Dataworkforce, Kineticom, Orin and Engineering Network International) (collectively respondents) filed motions for summary judgment, or alternatively summary

---

[2]    TNS originally filed cross-complaints against 43 staffing companies.  (See *Benton v. Telecom Network Specialists, Inc*. (2013) 220 Cal.App.4th 701, 706 fn. 1 (*Benton*).)  However, this appeal involves only seven of those 43 agencies.

[3]    The cross-complaint also included a claim for declaratory relief requesting a judicial declaration regarding TNS's right to indemnification.

adjudication, arguing that TNS could not prevail on any of the claims set forth in its cross-complaints. The respondents argued that TNS's express indemnity claim failed because the MSA only required them to defend and indemnify claims arising from "injury to or death of any person or damage to or destruction of physical property." In the respondents' view, this language made clear that the indemnity provision only applied to claims for bodily injuries and property damage, not statutory wage and hour claims. The respondents also argued that TNS had failed to state a claim for equitable indemnity because Texas law does not permit such a claim where the alleged duty to indemnify arises solely from a contractual relationship.

The respondents presented two reasons why they were entitled to judgment on TNS's contract claim. First, they argued that TNS could not establish it had been damaged by any purported breach of the MSA because the Benton action was based solely on "TNS's [own] actions" rather than any act or omission of any staffing agency. Second, respondents argued that the contract claim should be dismissed because it was merely "a restated claim for indemnity." As explained by one respondent: "Because TNS's indemnification obligations are spelled out in express language in the indemnification provision of the [MSA], that provision governs [the staffing agency's] liability and TNS cannot state a claim independent of that provision."

2. *TNS's opposition and separate motion for summary adjudication*

In opposition, TNS argued that the MSA's indemnity provision extended to any claim seeking compensation for an "injury" arising from the labor services that respondents had agreed to perform for TNS. According to TNS, the ordinary legal definition of the word "injury" necessarily encompassed violations of statutory wage and hour requirements. TNS contended that, contrary to respondents' assertions, the MSA's indemnity provision did not include any language suggesting the term "injury" was limited to "bodily" injuries.

TNS also argued that respondents had failed to demonstrate they were entitled to judgment on the equitable indemnity claim. Although TNS acknowledged the MSA's

6

Texas choice-of-law provision, it asserted that California law governed "[a]pplicability of [e]quitable [i]ndemnity" because "equitable indemnity is non-contractual in nature. Instead, equitable indemnity rests on equitable principles and thus does not implicate the 'Governing Law' provision contained in the MSA." TNS further argued that California law recognized a claim for equitable indemnity when "two parties in a contractual relationship were both responsible for injuring a third party." It did not address whether Texas law recognized a similar form of equitable indemnity.

On the breach of contract claim, TNS argued that respondents had failed to introduce any evidence showing that they did not breach the MSA or that the Benton action was not filed as a result of that breach. TNS explained that the mere fact the Benton plaintiffs had chosen not to name the staffing agencies in the underlying wage and hour litigation was insufficient to show that respondents had actually complied with their obligations under the MSA. TNS also argued that its breach of contract claim was not duplicative of its indemnity claim because it was based on different provision of the MSA.

In addition to its opposition, TNS filed its own motion seeking summary adjudication of its indemnity claims. TNS's motion presented essentially the same arguments it had set forth in its opposition to the respondents' motions for summary judgment. First, TNS argued that the word "injury" in the MSA's indemnity provision should be interpreted to "encompass[] the alleged violation of the putative [Benton] class members' legal rights under applicable California wage and hour laws." Second, TNS argued that even if the indemnity provision did not apply, it was entitled to equitable indemnity under California law: "Plaintiffs in the Benton Action seek to hold TNS jointly and severally liable as the joint employer of the putative class members for alleged wage and hour violations involving, *inter alia*, . . . the payment of overtime and meal/rest period compensation to the putative class members who were provided to TNS by each [respondent] . . . . If TNS is ultimately found liable as the joint employer of these individuals, equity dictates that it is entitled to indemnity from each of the [respondents],

7

whose responsibility it was to compensate and employ their workers in accordance with California law."

### D. The Trial Court Ruling

Prior to the hearing on the parties' cross-motions, the trial court issued a tentative order granting the respondents' motions for summary judgment and denying TNS's motion for summary adjudication. The tentative order explained that the "most important issue" was whether "in the context of the [MSA], 'injury' means 'bodily injury' or 'injury of any kind.'" The court explained that the MSA's inclusion of the phrase "or death to any person" immediately after the words "injury to" indicated that the term injury was intended to mean "bodily injury and not any injury." The court reasoned that interpreting the term injury to mean "'any injury' . . . would make the word 'death' redundant, for death IS an injury – the most severe injury of all." The court further concluded that the only interpretation that "avoid[ed] rendering the word 'death' mere surplusage" was to define injury as "bodily injury," explaining: "There is a tradition and familiar distinction in tort law between a suit for bodily injury and a suit for wrongful death. In a bodily injury case, the plaintiff is the injury victim – a living person. But in a wrongful death case, the injury has killed the victim, so the plaintiffs are the decedent's next of kin, who bring a 'wrongful death case instead of an 'injury' case. The drafters of this standard indemnity clause meant the indemnity to cover bodily injury cases: slip and falls and such. The drafters wanted the indemnity to apply (1) whether the bodily injury case were direct injury actions by the injury victims themselves or (2) whether the next-of-kin filed wrongful death claims after a fatal injury. This context makes sense of the words. It shows that the drafter had mind and meant to express."

On the issue of equitable indemnity, the trial court noted that TNS had "concede[d]" there is "no such cause of action under Texas law." Instead, TNS had argued only that its claim was governed by California law and that California recognized a claim for equitable indemnity where contracting parties were jointly liable to a third party as a result of their contractual relationship. The trial court found that Texas law

8

governed the issue and that respondents were therefore entitled to judgment. The court's tentative order did not reference TNS's breach of contract claim.

At the hearing, the parties presented argument on two primary issues: whether the MSA's indemnity provision extended to all forms of injury rather than just bodily injuries and whether California or Texas law governed the equitable indemnity claim. After hearing argument, the court adopted its tentative order as its final order and granted the respondents' motions for summary judgment. The court also addressed TNS's breach of contract claim, stating: "I can't see that there is any breach of contract issue that's separate, really from this indemnity discussion. So I would, on the cross motions, grant those cross motions." The court subsequently entered a judgment in favor of the seven respondents.

Following judgment, the court awarded respondents' attorney's fees pursuant to a "prevailing parties" provision in the MSA. TNS appealed the judgment and the order awarding attorney's fees.[4]

## DISCUSSION

### A. Standards Governing Summary Judgment

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107.) Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

---

**4** Several months after the trial court entered judgment in favor of respondents, we issued *Benton, supra,* 220 Cal.App.4th 701, which reversed the trial court's prior order denying certification of the wage and hour claims in the Benton action and remanded the matter for further proceedings.

To satisfy this burden, the moving defendant must show that at least one of the elements of the cause of action has not been established by the plaintiff and cannot reasonably be established, or must establish the elements of a complete defense to the cause of action. (§ 437c, subds. (o), (p)(2); *State of California v. Allstate Ins. Co*. (2009) 45 Cal.4th 1008, 1017 (*Allstate*).)  "If, and only if, the moving party carries that burden, the burden of production shifts to the opposing party to make a prima facie showing of the existence of a triable issue of material fact.  [Citation.]  'A prima facie showing is one that is sufficient to support the position of the party in question.  [Citation.]'" (*Roger H. Proulx & Co. v. Crest-Liners, Inc*. (2012) 98 Cal.App.4th 182, 194.)  "'The same standards apply to motions for summary adjudication.'  [Citation.]" (*Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1443.)

We review a trial court's order granting a motion for summary judgment or summary adjudication "de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Allstate, supra,* 45 Cal.4th at pp. 1017-1018.)

## B. *Respondents Are Entitled to Summary Adjudication of the Indemnity Claims*[5]

### *1. The MSA's indemnity provision does not extend to wage and hour claims*

TNS argues that the trial court erred in concluding that the MSA's indemnity provision does not extend to the statutory wage and hour claims at issue in the Benton action.  The parties do not dispute that the MSA's choice-of-law provision requires us to apply Texas law in interpreting the meaning of the contract.

---

**5**     Respondents contend that, on appeal, we should rely on the allegations in the first amended Benton complaint rather than allegations in the operative second amended Benton complaint.  Respondents have not identified any differences between the first and second Benton amended complaints that materially affect the issues in this appeal.  Accordingly, for purposes of clarity, we will refer to the allegations in the current operative pleading in the Benton action, which is the second amended complaint.

10

"[W]here [a] contract is in writing and the doubt as to its meaning arises from the language the parties used, and not from extrinsic matters . . ., the question as to what the parties meant is [a question of law] for the court." (*Dallas Hotel Co. v. Lackey* (Tx.Ct.App. 1947) 203 S.W.2d 557, 561; *Nalle v. Taco Bell Corp.* (Tx.Ct.App. 1996) 914 S.W.2d 685, 687 ["The meaning of language used in a contract is a question of law"].) "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." (*Valence Operating Co. v. Dorsett* (Tex. 2005) 164 S.W.3d 656, 662; see also *Associated Indem. Corp. v. Cat Contracting, Inc.* (Tex. 1998) 964 S.W.2d 276, 284 [indemnity agreements are "construed under the normal rules of contract construction"].)

Under Texas law, "indemnity agreements are strictly construed" against the party seeking indemnity. (*Webb v. Lawson-Avila Const., Inc.* (Tx.Ct.App. 1995) 911 S.W.2d 457, 461.) Moreover, where uncertainty exists "the contract language will be construed strictly against the party who drafted it since the drafter is responsible for the language used." (*Southern Disposal, Inc. v. City of Blossom* (Tex.Ct.App. 2005) 165 S.W.3d 887, 896.)

The disputed provision of the MSA states that the respondents will indemnify TNS for all claims and losses of any kind "by reason of injury to or death of any person or damage to or destruction of property" that arises out of any act or omission of the respondents and their agents "in the performance of the Work, except that the staffing agency shall not be responsible for any such losses . . . caused by the sole negligence or willful misconduct of TNS." TNS argues that because the word "injury" is not modified or limited by any accompanying term, we should construe the word in accordance with its ordinary meaning. (See *Nat'l Union Fire Ins. Co. v. Crocker* (Tex. 2008) 246 S.W.3d 603, 606 [courts must give "words their plain meaning, without inserting additional

11

provisions into the contract"].) TNS further contends that the ordinary legal meaning of "injury" is "[t]he violation of another's legal right, for which the law provides a remedy" (Black's Law Dictionary (9th ed. 2010) p. 856 (Black's)), which necessarily encompasses the wage and hour violations alleged in the Benton action.

TNS's proposed interpretation effectively isolates the word "injury" from the remainder of the indemnity provision. When interpreting a contract, however, "[w]e must look at all of the contract's parts together and be 'particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract.'" (*State Farm Life Ins. Co. v. Beaston* (Tex. 1995) 907 S.W.2d 430, 433; see also *Coker v. Coker* (Tex. 1983) 650 S.W.2d 391, 393 (*Coker*) ["No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument"].) In this case, additional language in the indemnity provision supports the trial court's conclusion that the term "injury" was not, as TNS suggests, intended to extend to every conceivable form of legal injury, but rather was limited to physical or bodily injuries.

First, as the trial court noted, the words "injury to" are immediately followed by the phrase "or death of any person." Death is a form of physical or bodily injury. (*Cf. Black's, supra*, at p. 856 [defining "bodily injury" and "physical injury" to mean ""[p]hysical damage to a person's body"].) Traditionally, the common law did not provide a civil remedy for actions that resulted in the death of another, reasoning that an "damages" from physical injury "'stop with the period of the [injured party's] existence.' [Citation.]" (*Marmon v. Mustang* (1968) 430 S.W.2d 182, 185, fn. 2.) As with virtually every jurisdiction, Texas has adopted a wrongful death statute that "chang[es] this common law rule" and provides recovery for surviving spouses, children and parents. (*Moreno v. Sterling Drug* (Tex. 1990) 787 S.W.2d 348, 356.) The fact that the term "injury" is accompanied by a reference to a specialized form of physical injury suggests that "injury" was not meant to apply to all conceivable forms of injury, but rather to bodily or physical harm. Although we have found no California or Texas decision interpreting this specific phrase, our conclusion is in accord with other jurisdictions that

12

have considered the issue.  (See *Northwest General Hosp. v. Yee* (Wis. 1983) 339 N.W.2d 583, 586 ["Since the words 'injury' and 'death' are used together, we conclude that the legislature intended injury to refer to those injuries involving actual bodily harm, and not simply to any legally recognized injury"];  *Dhanda v. Tri M, Ltd.* (Mass.App.Ct. 1987) 512 N.E.2d 1141, 1143 [statutory "language" permitting "damages" for "'negligence resulting in death or in injury to person' . . . suggests physical harm, rather than economic loss"].)

Second, interpreting the term "injury" to encompass every conceivable form of legal injury, as opposed to merely bodily injury, would effectively render meaningless other portions of the indemnity provision.  (See *Coker, supra*, 650 S.W.2d at p. 393 [court should select interpretation that "give[s] effect to *all the provisions* of the contract so that none will be rendered meaningless"] [emphasis in original].)  The indemnity provision states that it applies to claims and liability involving "injury to or death of any person or damage to or destruction of property."  If, as TNS contends, the term "injury" actually intended to refer to any form of legal injury there would have been no need for the parties to include separate references to "death" and "damage or destruction of property," which are also forms of legal injury.  (See generally *Baleares Link Exp., S.L. v. GE Engine Services-Dallas, LP* (Tx.Ct.App. 2011) 335 S.W.3d 833, 838 [describing "property damage" as a "type of injury"]; *Ruiz v. Guerra* (Tex.Ct.App. 2009) 293 S.W.3d 706, 716 [describing death as "distinct" form of injury].)  Interpreting the term "injury" to mean "bodily injury," in contrast, gives separate and distinct meaning to both "death" and "damage or destruction of property."  Interpreted in such a manner, the indemnity provision applies to three categories of claims:  physical injury, wrongful death (see *Rose v. Doctors Hosp.* (Tex. 1990) 801 S.W.2d 841, 845 [claim for personal injury is distinct from a statutory claim for wrongful death]) and property damage.

Finally, the trial court's decision to adopt a narrower interpretation of the term "injury" accords with the principles that an indemnity agreement must be strictly construed against an indemnitee and that uncertainties in contractual language should be resolved against the party who drafted the document.  There is no dispute that TNS is

both the party seeking indemnification and the party who drafted the MSA, which the staffing agencies were required to sign as a condition of doing business with TNS. As both the drafter and beneficiary of the indemnity provision, TNS could have included more precise language clarifying that the provision did in fact apply to all forms of legal injury, including those resulting from the staffing agency's failure to comply with labor requirements.

### 2. *Texas law does not recognize equitable indemnity based on a contractual relationship*

TNS also argues that the trial court erred in concluding that its equitable indemnity claim is precluded under Texas law. Although TNS does not challenge the applicability of Texas law,[6] it contends that Texas permits a claim for equitable indemnity where two parties are jointly liable to a third party as the result of a contractual relationship between them. According to TNS, that is the situation here because the the MSA "make[s] [the] [r]espondents responsible for the purported labor violations alleged [in the Benton action]."

Under Texas law, the availability of equitable indemnity (known as "common law" indemnity) "is extremely limited. [Citations.] Common law indemnity survives in Texas only in products liability actions to protect an innocent retailer in the chain of distribution and in negligence actions to protect a defendant whose liability is purely vicarious in nature. [Citation.] Vicarious liability is liability placed upon one party for the conduct of another, based solely upon the relationship between the two." (*Affordable Power, L.P. v. Buckeye Ventures, Inc.* (Tex.Ct.App. 2011) 347 S.W.3d 825, 833.)

In *Astra Oil Co., Inc. v. Diamond Shamrock Refining Co., L.P.* (Tex.Ct.App. 2002) 89 S.W.3d 702 (*Astra Oil*), the court held that a contractual relationship is insufficient to support a claim for common law indemnity under Texas law. The plaintiff in *Astra Oil* leased a cargo vessel from a third party to transport the plaintiff's oil.

---

[6] In the trial court proceedings, TNS argued that California law, rather than Texas law, governed its equitable indemnity claim. The trial court rejected the argument and applied Texas law. TNS has not appealed that portion of the trial court's ruling.

14

Plaintiff then entered into a separate contract for the sale of its oil with defendant. Under this sales contract, the defendant ensured the safety of the marine terminal where the oil was to be delivered. While the oil was being off loaded, the hull of the leased cargo vessel sustained damage. The third-party vessel owner sued plaintiff, who then filed "a claim for the vicarious liability incurred as a result of [the defendant's] breach of its contract with [plaintiff]." (*Id*. at p. 706.) In support, plaintiff relied on prior Texas decisions holding that "common law indemnity is recoverable by a defendant who, through no act of his own, has been made to pay for the negligence of another defendant based solely on the relationship between the two defendants." (*Ibid*.)

The court rejected the indemnity claim, stating: "[Plaintiff] fails to show that the relationship between [defendant] and itself is the type of relationship that imposes vicarious liability. In [the cases plaintiff cites], the relationship between the two defendants was an employer and employee relationship. In the case before us, [plaintiff] and [defendant] had a contractual relationship. [Plaintiff] cites no authority to support a finding of vicarious liability based solely on a contractual relationship. Under the facts of this case, [plaintiff] has not established a relationship to support its vicarious liability theory or to show it is entitled to common-law indemnity." (*Astra Oil, supra,* 89 S.W.3d at p. 706.) The court also noted that plaintiff appeared to have "confuse[d] its causes of action," explaining that if defendant had "breached its contract" by failing to "'to provide safe berth for the [third-party cargo vessel],'" plaintiff "must pursue a breach of contract . . . cause of action." (*Id*. at p. 706, fn. 2.)

In *American Alloy Steel, Inc. v. Armco, Inc.* (Tex.Ct.App. 1989) 777 S.W.2d 173 (*American Alloy*), the plaintiff brought a similar indemnity claim against a steel plate supplier. Plaintiff entered into a purchase agreement with defendant for a steel plate, which plaintiff then sold to a third party. The third-party buyer subsequently alleged that the plate was defective. Plaintiff agreed to replace the plate and then sued defendant for common law indemnity and various related claims. The issue presented on appeal was "whether . . . an implied obligation of indemnity ar[o]se out of the contractual relationship between the two companies[.]" (*Id*. at p. 175.) The court concluded that

15

plaintiff could not pursue such a claim, explaining that Texas law only recognized implied or common law indemnity in cases "arising out of a tort" or involving "agency or surety principles."[7] (*Ibid*.)  In contrast, the plaintiff and the defendant were merely "parties to a contract with the freedom to negotiate its terms, keeping in mind their individual needs and circumstances."  (*Id*. at pp. 175-176.)

As in *Astra Oil* and *American Alloy*, TNS's equitable indemnity claim is based solely on its contractual relationship with respondents.  The Benton action asserts claims against TNS for failure to comply with overtime and rest and meal break provisions.  TNS's cross-complaints, in turn, allege that the respondents must indemnify it for any liability incurred in the Benton action because the MSA obligated each staffing agency to ensure compliance with overtime provisions and other labor code requirements.  *Astra Oil* and *American Alloy* demonstrate that, under Texas law, the contractual relationship between TNS and respondents is not sufficient to support a claim for equitable indemnity.

### C. Respondents Failed to Satisfy their Initial Burden of Production on TNS's Breach of Contract claim

TNS argues that the trial court erred in entering judgment on its contract claim, which alleges that respondents breached the MSA by failing to pay their technicians overtime or adopt a valid meal and rest break policy, thereby causing the Benton plaintiffs to file a class action against TNS.  The claim further contends that any liability TNS ultimately incurs in the Benton action constitutes a form of damages resulting from the respondents' failure to discharge its contractual obligations.

To prevail on this claim at the summary judgment phase, the respondents were required to make a prima facie evidentiary showing that TNS cannot establish an element of the claim, or otherwise demonstrate a complete defense to the claim.  (*Aguilar, supra,* 25 Cal.4th at p. 854 [fn. omitted].)  The trial court's written order granting summary judgment does not explain why it dismissed the breach of contract claim.  We will

---

[7]  TNS has never argued that the staffing agencies are its agents.  Indeed, the cross-complaints (and the MSA) specifically assert that TNS's contractual relationship with its staffing agencies "does not create any . . . agency . . . relationship."

16

therefore independently review each ground set forth in the memoranda respondents filed in support of their motions for summary judgment.

### 1. *TNS's breach of contract claim is not duplicative of its indemnity claim*

In the trial court, the respondents argued that TNS's contract claim failed as a matter of law because it was a "restated claim for indemnity."[8] Respondents reiterate this argument again on appeal, asserting that "a trial court has discretion to 'ferret out' artfully pleaded affirmative claims that are, in fact, actual claims for indemnity" and that "TNS's breach of contract theory is nothing more than a claim for indemnity in disguise." Respondents contend that "[t]he obligations of each party are spelled out in the express indemnity language in the MSAs and that provision governs the potential liability of the staffing companies. . . . TNS cannot state a claim independent of that provision."

We do not agree that TNS's breach of contract claim is merely "duplicative" of its claim for express indemnity. As respondents acknowledge, TNS's express indemnity claim asserts that section 8 of the MSA imposes a duty on the respondents to defend TNS in the Benton action and indemnify it for any losses incurred as a result of that action. TNS's breach of contract claim, in contrast, is predicated on separate contractual obligations set forth in the MSA. In particular, TNS contends that respondents breached section 5, subdivision (h), of the MSA, which states that the staffing agency "shall be solely responsible and liable for compensate[ing]" the technicians that service TNS's clients. TNS further contends that the respondents breached section 14 of the MSA, which requires the staffing agency to "comply with the provisions of all applicable federal, state, county and local laws . . . in its performance of all Work . . . including . . . laws relating to labor standards." Given that the breach of contract claim is not predicated on the same contractual provision as its indemnity claim, we fail to see how it can be construed as a "duplicative" claim.

---

**8** Although the trial court's written order does not address TNS's contract claim, its statements at the summary judgment hearing suggest it agreed that the claim was merely duplicative of the indemnity claims, explaining "I don't see . . . any breach of contract issue that's separate . . . from this indemnity discussion."

17

We also reject respondents' suggestion that "TNS cannot state a [contract] claim independent of . . . [t]he obligations . . . spelled out in the express indemnity [provision]." The indemnity provision merely describes the types of claims for which respondents owe TNS a duty to indemnify. Nothing in the indemnity provision suggests that respondents may breach other contractual obligations set forth elsewhere in the MSA. Under the respondents' theory, if TNS is ultimately required to pay the Benton plaintiffs for overtime that was improperly withheld from them by staffing agencies, TNS will have no legal remedy against the staffing agencies despite the MSA's express requirement that each staffing agency is "solely responsible and liable for compensating" those individuals.

The only legal authority respondents cite in support of their assertion that a trial court may dismiss "disguised" indemnity claims involve application of Code of Civil Procedure section 877.6, which governs the effect of a settlement between a plaintiff and a joint tortfeasor. For example, in *Cal-Jones Properties v. Evans Pacific Corp.* (1989) 216 Cal.App.3d 324—discussed at length in the respondents' brief—a home purchaser filed a fraud action alleging that the seller and real estate broker had knowingly misrepresented the size of the property. The seller filed a cross-complaint against the real estate agent for breach of fiduciary duty, equitable indemnity and contribution asserting that the agent had violated its legal obligations by failing to advise the seller of the true size of the home. The real estate agent reached a settlement with the buyer that was contingent upon a judicial determination of good faith and dismissal of the seller's cross-claims under section 877.6. The seller opposed the motion on the ground that his claim for breach of fiduciary duty was "separate and distinct" (*id*. at p. 327) from his claim indemnity and contribution claims "and therefore should not be barred by respondents' good faith settlement. [¶] The trial court ruled that the settlement was made in good faith and that the breach of fiduciary duty claim was barred because it was nothing more than an alternative means of pleading indemnity." (*Ibid*.)

The appellate court affirmed, explaining that "Section 877.6 provides that a good faith settlement bars other joint tortfeasors from any further claims of indemnity or

18

contribution against the settling tortfeasor. . . 'based on comparative negligence or comparative fault.' [¶] The purpose of this statute is to bar claims against a settling tortfeasor and thereby promote settlement. [Citation.] Allowing a joint tortfeasor to bring an affirmative claim for damages that is actually an artfully pleaded claim for indemnity would contravene the purpose of the statute. . . . Few joint tortfeasors would be willing to settle with plaintiffs if they knew another tortfeasor could bring an action on the same issues by merely cloaking claims of indemnity in affirmative language. Therefore, a trial court must have the discretion to ferret out those claims that are in fact claims for indemnity." (*Id*. at pp. 327-328.) The court then analyzed the basis for the seller's breach of fiduciary duty claim and concluded that "[a]lthough labeled . . . as a breach of fiduciary duty cause of action, it was in effect simply an indemnity action" and therefore precluded under section 877.6.

The other cases on which respondents rely—*Gackstetter v. Frawley* (2006) 135 Cal.App.4th 1257 (*Gackstetter*) and *Norco Delivery Service v. Owens Corning Fiberglass* (1998) 64 Cal.App.4th 955 (*Norco*)—apply *Cal-Jones*'s holding that "[f]ollowing a good faith determination [under section 877.6], the judge . . . may dismiss disguised or artfully pleaded claims for indemnity or contribution - - i.e., causes of action purporting to state direct claims but which, in fact, seek only to recover derivative damages." (*Norco*, *supra*, 64 Cal.App.4th at 964 [citing *Cal-Jones*]; *Gackstetter, supra*, 135 Cal.App.4th at p. 1274 ["a party may not avoid a section 877.6 motion by providing different labels for what are in reality indemnity or contribution claims"] [citing *Cal-Jones*].) In both cases, the courts considered whether one joint tortfeasor's claim against another joint tortfeasor who had entered into a good faith settlement with the plaintiff in the underlying action was, in effect, a claim for indemnification and therefore precluded under section 877.6.

The rule set forth in *Cal-Jones*, *Gackstetter* and *Norco Delivery* applies only when there has been a good faith settlement determination under section 877.6. Respondents have provided no explanation why the rule should be applied outside that context.

19

## 2. *TNS's contract claim is not barred based on the fact that the Benton complaint does not reference respondents' conduct*

The respondents also argue that TNS cannot prevail on its contract claim because it has not been sued "based on any policy or practice" of a staffing agency. Rather, the Benton action seeks "damages arising out of TNS's [own] failure to comply with all laws, regulations, codes or other legal directives in the performance of the work." Stated more simply, respondents contend TNS cannot demonstrate it was damaged by respondents alleged breach of the MSA because "none of the staffing companies' policies or practices were the subject of the Benton plaintiffs' complaint."

This argument misstates the nature of TNS's breach of contract claim. In the Benton action, plaintiffs allege that TNS was the joint employer of every technician who performed services for TNS, including those technicians who were hired and paid by a staffing agency. The Benton plaintiffs further contend that because TNS was a joint employer, it is directly liable to the technicians for unpaid overtime and failure to adopt a meal and rest period provisions regardless of whether another joint employer might also be liable for those statutory violations. (See generally *Martinez v. Combs* (2010) 49 Cal.4th 35, 59 [definition of employer "reach[es] situations in which multiple entities control different aspects of the employment relationship, as when one entity, which hires and pays workers, places them with other entities that supervise the work"].) In its cross-claim for breach of contract, TNS claims that, under the terms of the MSA, the staffing agencies were responsible for fulfilling the statutory duties at issue in the Benton action. Thus, according to TNS, if it is ultimately found liable to the Benton plaintiffs as their joint employer, it may seek contract damages against respondents for failing to discharge their duties under the MSA. The mere fact that the Benton plaintiffs elected to seek recovery for the alleged wage and hour violations from TNS, rather than the staffing

20

agencies, does not preclude TNS from pursuing a contract claim against the staffing agencies.[9]

### 3. *Respondents have forfeited additional arguments raised in support of summary judgment*

Respondents raise two additional arguments in support of the trial court's decision to dismiss TNS's breach of contract claim. First, respondents assert that although section 7 of the MSA "obligated [TNS] to control the Work site," the "undisputed evidence showed that TNS . . . seldom visited the worksite and had little interaction with the workers." According to respondents, "TNS's admitted and undisputed failure to properly supervise and manage the workers and the worksite materially beached its own contractual obligations, precluding recovery on a breach of contract theory."

The record shows that respondents did not raise this argument in the opening memoranda filed in support of their motions for summary judgment. The only two arguments respondents initially raised in the trial court were that: (1) the contract claim should be dismissed because it was duplicative of the indemnity claim; and (2) TNS could not prevail on its contract claim because the Benton action was based on TNS's own allegedly illegal practices and policies, and not those of its staffing agencies. It was only after TNS addressed those arguments in its opposition brief that respondents raised the issue of TNS's purported failure to properly supervise the work sites in its reply brief.

---

[9]     Respondents also argue that TNS cannot satisfy the damages element of its contract claim because the form of damages it seeks to recover—the attorney's fees incurred in defending against the Benton action—are not available in a contract action. Respondents cite no authority addressing whether attorney's fees qualify as a form of contract damages when the defendant's breach causes a third-party lawsuit to be filed against the plaintiff. For the purposes of this appeal, however, we need not decide that issue. TNS's cross-complaints make clear that it has alleged two types of damages: the fees it has incurred in defending against the Benton action and any liability it ultimately incurs in that action. Even if respondents are correct that TNS cannot recover its attorney's fees incurred in the Benton action, they have provided no argument explaining why it is precluded from recovering as damages any liability it ultimately incurs in that action that is the result of respondents' breach of the MSA.

21

Principles of fairness preclude parties from raising arguments for the first time in a reply brief. (See generally *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 ["Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument"].) Although this rule is most commonly applied to arguments first raised in an appellate reply brief, the rule may also be applied to briefing and argument in the trial court. (See *St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 783; *Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362 at fn. 8 [trial court should only permit party moving for summary judgment to include "additional . . . matter[s]" in its reply brief in "exceptional cases"].)

The inherent unfairness of raising a new argument in a reply brief is particularly pronounced in the context of a motion for summary judgment. As explained above, the procedures governing summary judgment require the moving party to make a prima facie evidentiary showing that the opposing party cannot establish an element of his or her claim. The opposing party then has an opportunity to explain why the moving party has failed to discharge this initial prima facie burden or alternatively respond with rebuttal evidence demonstrating there is a triable issue of fact on the disputed issue. Where, as here, the moving party raises an entirely new argument for the first time in a reply brief, the opposing party is never permitted a chance to respond with his or her own counter argument or rebuttal evidence. As explained by one court, "[w]here a remedy as drastic as summary judgment is involved, due process requires a party be fully advised of the issues to be addressed and be given adequate notice of what facts it must rebut in order to prevail." (*San Diego Watercrafts, Inc. v. Wells Fargo Bank, N.A.* (2002) 102 Cal.App.4th 308, 316 [in ruling on motion for summary judgment, trial court erred in relying on evidence moving party "submitted with its reply papers"].)

Even if respondents had properly raised this argument in the trial court, they have failed to make a prima facie showing that TNS breached its material obligations under the MSA. The respondents assert that TNS breached a provision of the MSA stating that TNS's designated site manager "shall be in control of the Worksite, and [the staffing

22

agency technicians] shall follow his directions at all times." The only evidence they cite in support of this contention is a declaration from a TNS project manager stating that he normally emailed technicians a list of the jobs that needed to be completed each day and then visited the sites after the technicians had left to check their work. According to the project manager, "[b]esides sending out the email giving the workers their site lists, [he] had little interaction with [the technicians] on a daily basis." Respondents provide no argument or analysis explaining why these statements are sufficient to demonstrate that TNS was not "in control" of the work site within the meaning of the MSA. Respondents assume, without explanation, that TNS could only "be in control" of the worksites by having a supervisor present to oversee the work. Given the absence of any reasoned analysis or citation to authority supporting this legal assumption, we disregard respondent's argument. (See *People v. JTH Tax, Inc*. (2013) 212 Cal.App.4th 1219, 1260 [disregarding argument accompanied by "virtually no legal analysis"]; *Nelson v. Avondale Homeowners Assn*. (2009) 172 Cal.App.4th 857, 862 [conclusory statements do not qualify as "cogent legal argument"].)

Respondents separately contend that the evidence TNS submitted in support of its oppositions to the motions for summary judgment "establish[es] that the staffing companies did in fact . . . pay for meal and rest breaks [and] overtime, thus defeating its claim that the staffing companies breached the contract." In support, respondents cite declarations from two technicians who worked for respondent Dataworkforce stating that they received overtime pay and were able to take meal and rest breaks. An additional declaration from a technician who worked for respondent Ritesync states that he was notified of California's meal and rest period rules and was able to take breaks during his workday.

In the trial court proceedings, respondents never argued that they were entitled to judgment on TNS's contract claim because the evidence demonstrated that they did pay overtime and had adopted a valid meal and rest period policy. In fact, the record shows that respondents specifically argued that the technician declarations described in the

23

preceding paragraph "were . . . not relevant to the case at hand" because the declarants were not plaintiffs in the underlying Benton action.

When reviewing a ruling on a motion for summary judgment, ""[a]n argument or theory will . . . not be considered if it is raised for the first time on appeal. [Citation.] Specifically, in reviewing a summary judgment, the appellate court must consider only those facts before the trial court, disregarding any new allegations on appeal. [Citation.] Thus, possible theories that were not fully developed or factually presented to the trial court cannot create a "triable issue" on appeal. [Citation.] 'A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' [Citation.]" (*DiCola v. White Bros. Performance Products, Inc*. (2008) 158 Cal.App.4th 666, 676.)

### *D. The Trial Court's Order Awarding Attorney's Fees Must be Vacated*

TNS has also appealed the trial court's postjudgment order awarding respondents the attorney's fees they incurred in defending against TNS's cross-claims. The court concluded that respondents were entitled to fees pursuant to a provision in the MSA stating that the "prevailing party" in any "dispute[] arising under or related to [the] Agreement" shall be awarded its attorney's fees. The court explained that respondents qualified as "prevailing parties" because they had "fought off TNS's invalid . . . suit." Because we reverse the court's judgment in favor of respondents, we must also vacate the attorney's fees award that was predicated on that judgment.

**DISPOSITION**

The judgment is reversed and the order awarding respondents' their attorney's fees is vacated. The matter is remanded to the trial court for further proceedings consistent with this opinion. Upon remand, the court shall enter an order granting respondents summary adjudication of TNS's claims for express indemnity, equitable indemnity and

24

declaratory relief; [10] denying summary adjudication of TNS's claim for breach of contract; and denying TNS's motion for summary adjudication.  The parties shall bear their own costs on appeal.


ZELON, J.


We concur:


PERLUSS, P. J.


FEUER, J.[*]

---

**10**    Because we conclude respondents are entitled to summary adjudication on TNS's claims for express and equitable indemnity, they are also entitled to summary adjudication of TNS's declaratory relief claim, which seeks a judicial declaration that it is "entitled to defense and indemnity from [the respondents]."

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.